UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD DEAN COLE, | ) Case No.: 1:16-cv-0754-BAM |
| Plaintiff, | ) **ORDER REGARDING PLAINTIFF'S** |
| v. | ) **SOCIAL SECURITY COMPLAINT** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## **INTRODUCTION**

Plaintiff Gerald Cole ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Barbara A. McAuliffe. The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards. Accordingly, this Court affirms the agency's determination to deny benefits.

## **FACTS AND PRIOR PROCEEDINGS**

On May 3, 2010, Plaintiff filed his first application for supplemental security income alleging disability beginning March 30, 1992. Administrative Record ("AR") 162-66. The agency denied

1

Plaintiff's claim initially and on reconsideration. AR 69-72, 75-80, 85-90. Administrative Law Judge Sharon Madsen ("ALJ") held a hearing on December 20, 2011. AR 33-57. In a decision dated February 9, 2012, the ALJ determined that Plaintiff was not disabled. AR 17-32. Plaintiff appealed the ALJ's decision to the Appeals Council, which denied review on June 26, 2012, making the ALJ's decision final for judicial review. AR 1-4. 42 U.S.C. § 405(g).

Thereafter, Plaintiff filed an action in the United States District Court, Eastern District of California following the denial of his 2010 application. AR 1479. On November 1, 2013, the District Court reversed and remanded the case for further administrative proceedings. AR 1492- 1506. In the second administrative hearing, Plaintiff testified before the ALJ on June 12, 2014. AR 1401-1432. On July 18, 2014, ALJ Sharon Madsen issued a second decision denying Plaintiff's application. AR 1382-1400. The Appeals Council denied review on March 28, 2016, making the ALJ's decision final for judicial review. AR 1370-74. 42 U.S.C. § 405(g).

**Statement of Facts**

Born on August 20, 1965, Plaintiff was 46 years old at the time of the initial administrative hearing. AR 1404. Plaintiff has faced significant hardship and struggles throughout his lifetime. When he was 22 years old, Plaintiff shot and killed his father; he was acquitted after the death was determined a justifiable homicide. AR 507, 1011, 1071, 1319. In June 2000, Plaintiff suffered third-degree burns when he was involved in a fire at his home. AR 383, 1442. Plaintiff had multiple skin graft surgeries and a laparotomy (exploratory abdominal surgery) due to complications. AR 293. Plaintiff has a history of methamphetamine use but last used after sustaining his burns in 2000. AR 384. Prior to his more recent disability applications, Plaintiff was receiving disability benefits in 1993; his benefits were later suspended after he was incarcerated.

At the first hearing on December 20, 2011, Plaintiff reported he had a tenth grade education, and did not have any vocational training. Plaintiff testified he lived behind his brother's house in a trailer with no electricity or running water. AR 1438. He had been released from prison on July 13, 2009 and had not been incarcerated since then. AR 1438. He was able to do some yardwork, but he had difficulty showering because of a reduced range of motion in his arms (due to skin grafts) and he did not do much shopping. AR 1439.

2

For social activity, he went to Hope House two or three times a week where he tried to socialize and he visited with different friends. AR 1440, 1449. He had undergone treatment for Hepatitis C about four or five years prior to the hearing. AR 1441.

Plaintiff also testified that because of his burns, he had trouble moving his neck. AR 1442. He had little strength in his left arm and could not completely close his left hand. AR 1442. There was pleural thickening in his lungs caused by inhaling flames, which caused shortness of breath, and his left knee gave out on him occasionally. AR 1443-44. He estimated he could walk about a block and could stand for 10 to 15 minutes before having to sit for about an hour. AR 1444. Both of his hands were weak and he estimated he could lift 20 pounds with his left arm and 30 pounds with his right arm. AR 1447-48.

When asked about his mental impairments, Plaintiff testified he struggled with depression, which made him suicidal, and sometimes he heard voices. AR 1445. It was difficult for him to read because his mind raced. AR 1445. His medications helped with the voices, but he had trouble sleeping. AR 1446.

After the District Court remanded his case, Plaintiff had a second hearing in June 2014. AR 1401. At that time, Plaintiff testified he had been staying at the Mission for two years. AR 1404-05. He had not had any additional jail time since being released from prison in July 2009. AR 1405. He could wash dishes and microwave meals. AR 1406.

During a typical day, he went to the park or Hope House. AR 1406. He had pain in his left elbow and he had reduced strength and range of motion in his arms because of his burns and related skin grafts. AR 1407-08. His knees hurt all the time and he could not turn his head. AR 1408-09. Plaintiff estimated he could lift and carry 10 to 15 pounds, stand for a half-hour and walk a couple of blocks. AR 1409. Because of scarring, he had difficulty lifting his arms overhead and holding onto objects. AR 1410. Plaintiff estimated he could use his hands for 5 to 10 minutes at a time before having to rest them for about a half-hour. AR 1416. If he used his hands frequently throughout the day, he would have spasms in his hands. AR 1417.

He was paranoid around crowds and was unable to keep track of what was going on. AR 1411. He isolated himself and some days he did better around people than on other days. AR 1418. When

asked if his medications helped his symptoms, Plaintiff responded he could not tell. AR 1411. When his blood sugars got low (about every two weeks), he became dizzy and sweaty. AR 1412. He was in constant pain in the areas where he had been burned. AR 1414-15. He also easily became overheated because he had no sweat glands in the burned areas. AR 1415.

At the conclusion of the hearing, the ALJ heard testimony from a vocational expert who answered hypothetical questions posed by the ALJ. AR 1420-1429.

### **Relevant Medical Evidence**

On April 10, 2010, Plaintiff was diagnosed with PTSD and referred to see a doctor for evaluation regarding his PTSD symptoms, which included flashbacks, anxiety, hyperarousal and hypervigilance. AR 304-05. Days later, there was another note for referral for psychiatric care, specifically noting that Plaintiff was in the process of getting SSI, had an attorney who stated he needed to see a "psych to progress on the case." AR 306. Plaintiff had no complaints at the time, though he reported a history of auditory hallucinations. Upon examination, Plaintiff was alert, had appropriate judgment, good insight, fully oriented and had euthymic mood with appropriate affect. AR 307. Plaintiff was diagnosed with schizophrenic disorders.

On February 19, 2011, consultative examiner, Ekram Michiel, M.D., conducted a psychiatric evaluation. AR 383-86. Upon examination, Plaintiff stated he had bad dreams and flashbacks from when he was burned alive. AR 383. He also reported panic attacks around people. Plaintiff said he was last admitted to a hospital in 1990 when he attempted suicide and was previously on psychotropic medication, but had not taken any for many years. AR 384. Plaintiff denied suicidal/homicidal ideations and his thought process was goal-directed, though guarded, and his thought content was devoid of delusions, hallucinations and illusions. AR 385. Dr. Michiel diagnosed anxiety disorder, depressive disorder, PTSD disorder and assessed a GAF score of 50. Dr. Michiel believed that Plaintiff was able to maintain attention and concentration and carry out simple repetitive job instructions; interact with co-workers, supervisors, and general public; could not carry out detailed/complex instructions; had no restrictions to his activities of daily living; and could handle his own funds. AR 385-86.

A month later, on March 29, 2011, Plaintiff went to the emergency room for suicidal ideations.

4

AR 450-56. No issues were reported upon examination. AR 452. Plaintiff was diagnosed with depression, psychosis, and PTSD. AR 453. On March 30, 2011, Plaintiff was placed on involuntary (5150) hold after he told a police officer that he wanted to kill himself. AR 438-42, 993. Plaintiff reported he lived with his brother in a trailer with no electricity and did not want to go back. AR 1030. A mental status examination the next day, on March 31, 2011, was normal and revealed no evidence of psychosis, but observed Plaintiff's mood was depressed, his affect was blunted and his insight and judgment were limited. AR 1011-12. Plaintiff was diagnosed with major depressive disorder, severe, and assessed a Global Assessment Functioning (GAF) score of 20. AR 1012. After his three-day legal hold expired, Plaintiff was certified for 14 more days of involuntary hospitalization. AR 1000. On April 13, 2011, Plaintiff was discharged because his symptoms had become more stable and improved. AR 1008. Dr. Whitman indicated Plaintiff had achieved a good level of improvement during his hospitalization and his long-term progress was fair. AR 1008.

Plaintiff was again placed on involuntary hold on April 2, 2011 and stated killing himself would be a better alternative than where he lived. AR 996, 1019. Plaintiff was also experiencing homicidal fantasies. AR 996. On April 10, 2011, Plaintiff said he felt better when he wanted to help another patient in his unit. AR 1016. It was also noted that Plaintiff "socialized well with others." AR 1291. On April 12, 2011, Plaintiff said he felt less depressed on medication. AR 1020. Plaintiff was discharged on April 13, 2011 after he became stable with "good level" of improvement. AR 1008. Plaintiff was diagnosed with major depressive disorder and assessed a GAF score of 50 upon discharge. AR 1009, 1038. Progress notes during his stay at Kaweah Delta Mental Health Center revealed auditory and visual hallucinations and claims of self-reported depression and anxiety. (See generally AR 1227-1307).

The next month, on May 30, 2011, Plaintiff again presented to an ER with suicidal ideation. AR 424. Andrea Bates, M.D., a psychiatrist at Kaweah Delta, observed during her clinical interview that Plaintiff's cognition was grossly intact but his concentration and attention were impaired. AR 764. His mood was anxious and depressed, his affect was blunted, and he had auditory and visual hallucinations. AR 764. Plaintiff was certified for 14 more days of involuntary acute psychiatric care because he was having trouble functioning and intermittently thought of killing himself. AR 712.

Plaintiff was diagnosed with mood disorder, not otherwise specified (NOS), and assessed a GAF score of 20. AR 757.

Ultimately, in evaluating Plaintiff's hospital stay, Dr. Bates determined that Plaintiff appeared to "over-endorse his symptoms, [he was] overly vague" and he did not have the normal variation of symptoms on a daily basis and was not "very credible" when talking about his symptoms as it related to his hospital stay. AR 768. Dr. Bates further reported that Plaintiff appeared to be motivated by secondary gain. Dr. Bates found Plaintiff's suicidal thinking lacked credibility, but did not discharge him and assessed a GAF score of 30. AR 769. Plaintiff was "very happy" when he was told that he was placed on involuntary hold and said he wanted to stay for a couple more weeks. AR 934.

On June 3, 2011, Dr. Bates wrote that Plaintiff was not a "very believable historian about being 'suicidal'" and she believed he may not be suicidal. AR 773. Though Plaintiff listed his depression as 8 out of 10, he comfortably watched television with his peers, interacted with staff, and actively participated in a group session, though he did not attend other group sessions. AR 930-32.

On June 7, 2011, Dr. Bates noted that she needed to assess the "chronicity" of Plaintiff's complaint because Plaintiff may not ever become "not suicidal" as he was motivated to stay in the hospital. AR 771. Shortly before Plaintiff's discharge, Plaintiff's brother reported to Plaintiff's social worker that Plaintiff says he was "suicidal" but was not really suicidal. Additionally, when the worker told Plaintiff's brother about Plaintiff's suicidal ideations, he laughed and said "he's only there to get SSI" and that he did not believe Plaintiff was suicidal and thinks his brother "just wants to get SSI." AR 787. By June 8, 2011, Plaintiff was discharged and Dr. Bates noted that Plaintiff was stable and was not in any distress nor did he have active signs of psychosis. AR 760.

On July 24, 2011, Plaintiff was placed on suicide watch after he stated he wanted to hang himself following another argument with his brother's girlfriend. AR 411. Plaintiff had a normal physical examination, except he had low glucose and acute depression. AR 413-14. During his hospital stay, Frederick Houts, M.D conducted a mental status examination where Plaintiff was not in gross distress, but had depressed mood with restricted affect and was anxious during the interview. AR 509. Plaintiff's memory and orientation was intact, and he had average intelligence. Dr. Houts diagnosed major depressive disorder, recurrent, severe, with psychotic features and assessed a GAF

score of 30. AR 509-10. Progress notes also revealed that Plaintiff sat and watched television with peers, was calm and cooperative. AR 682. Plaintiff said he felt safe in the hospital, but would have suicidal thoughts if he was discharged. By August 1, 2011, when Plaintiff was discharged, Plaintiff's mental status examination revealed mildly depressed mood with constricted affect, fully oriented, fair attention, goal direct thoughts, no hallucinations, paranoia or delusions, and fair judgment and insight AR 503-04.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 1382-1393. More particularly, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since his application date. AR 1384. Further, the ALJ identified status post burns with skin grafts, bilateral knee degenerative joint disease, left elbow degenerative joint disease, depression and anxiety as severe impairments. AR 1384. Nonetheless, the ALJ determined that the severity of Plaintiff's impairments did not meet or exceed any of the listed impairments. AR 1385.

Based on her review of the entire record, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a simple, routine light work with occasional reaching overhead and fine manipulation with his left hand. AR 1386. The ALJ found that although Plaintiff had no past relevant work there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. AR 1393. The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. AR 1393.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be

considered, weighing both the evidence that supports and the evidence that detracts from the Commission's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

## DISCUSSION[1]

Plaintiff argues that the ALJ (1) failed to properly weigh his treating physician's opinion; (2) failed in her duty to develop the record with respect to his knee impairments; and (3) erred in rejecting his subjective pain testimony. (Doc. 23 at 15-28).

**1.  The ALJ Did Not Err in Weighing the Treating Physician Opinion**

Plaintiff first argues that in fashioning his mental RFC, the ALJ failed to provide specific and legitimate reasons for rejecting the findings of Dr. Orlando Collado, Plaintiff's treating physician. (Doc. 23 at 16-21). According to Plaintiff, he was treated by Dr. Collado on numerous occasions

---

[1] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits. Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

8

following his three hospitalizations in 2011 for suicidal thoughts. AR 1362-1365. Dr. Collado diagnosed Plaintiff with major depression with psychotic features and post-traumatic stress disorder. AR 1320, 1665. Dr. Collado opined that based on his mental impairments, Plaintiff was unable to relate to or interact with supervisors or coworkers, could not perform simple work, and he could not withstand the stress and pressures associated with an eight-hour workday and day-to-day workweek. AR 1665.

### A. The ALJ's Assessment of Dr. Collado's Opinion

In rejecting Dr. Collado's opinion, the ALJ stated:

> In this case, mental health treatment records do not support the conclusions of Dr. Collado. In fact, Dr. Collado reported on March 24, 2014 that claimant was stable, compliant with the medication program, and had no side effects or adverse reactions. The claimant was in no acute distress, and was relevant and coherent. The claimant stated he was doing fine and was not hearing voices. Because Dr. Collado's medical source statement is inconsistent with the treatment record, as well as with the other evidence of record, I cannot accord any significant weight to this assessment.

AR 1389.

Although not specifically identified by the ALJ as a basis for its rejection, Dr. Collado's opinion is contradicted by the medical opinion evidence of examining physician Dr. Ekram Michiel who performed a consultative psychiatric examination on February 19, 2011. AR 383-386. Upon examination, Dr. Michiel determined that Plaintiff suffered from an anxiety disorder and a depressive disorder. AR 385-386. Dr. Michiel opined Plaintiff was able to maintain attention and concentration to carry out simple repetitive job instructions; interact with co-workers, supervisors, and general public; but could not carry out detailed/complex instructions; had no restrictions to his activities of daily living; and could handle his own funds. AR 385-86. Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Collado's opinion.

### B. The ALJ Provided Specific and Legitimate Reasons

The ALJ properly rejected Dr. Collado's assessment of Plaintiff because it was not consistent the objective medical evidence, including Dr. Collado's own treatment notes. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's

9

opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (same); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings); *Teleten v. Colvin*, No. 2:14-CV-2140-EFB, 2016 U.S. Dist. LEXIS 43985, 2016 WL 1267989, at *5-6 (E.D. Cal. Mar. 31, 2016) ("An ALJ may reject a treating physician's opinion that is inconsistent with other medical evidence, including the physician's own treatment notes.").

As the ALJ noted, Dr. Collado's treatment notes largely indicated that Plaintiff was stable, compliant on his medication and that Plaintiff reported "doing fine." AR 1388-89, 1645-64. The ALJ relied on Dr. Collado's treatment notes between December 21, 2011 and June 6, 2014 that frequently noted that Plaintiff was alert, maintained good eye contact, was cooperative, had unremarkable behavior though his mood was anxious, sad, and depressed, had normal speech, depressive thought content within normal limits, fully oriented, impaired ability to concentrate, good memory but poor insight and impaired judgment. AR 1366-69.

Dr. Collado's treatment notes also demonstrated a decline in Plaintiff's impairments over time. On August 28, 2012 and October 26, 2012, Plaintiff was noted as compliant with his medication and he reported doing "somewhat better." AR 1649, 1651. On January 22, 2013, Plaintiff, again compliant with his medication and demonstrating no side effects, was reportedly doing "much better." AR 1653. On April 24, 2013, Dr. Collado conducted a mental status examination and observed that Plaintiff was alert, friendly and was stable with his medication. AR 1655. Plaintiff reported that he was "doing fine" and denied suicidal/homicidal ideations and said he only sees things "at times." AR 1655. By July 17, 2013, Plaintiff said he was not depressed and his medications were working. AR 1657. Plaintiff denied hallucinations or suicidal/homicidal ideations. AR 1657. Dr. Collado continued to report Plaintiff's condition as stable with no auditory hallucinations and suicidal/homicidal ideations AR 1659. Plaintiff was again stable with no abnormal findings on December 30, 2013 and March 24, 2014. AR 1661, 1664.

Such consistently normal findings fail to support Dr. Collado's extreme opinion that Plaintiff is incapable of basic functioning. As shown above, Dr. Collado's treatment records demonstrated

largely mild mental impairments, yet Dr. Collado's June 6, 2014, medical source statement stated that Plaintiff was completely unable to interact with others, unable to complete complex tasks, unable to complete simple tasks, and unable to deal with the public, maintain concentration, or withstand any stress in the workday. AR 1665. Indeed, of the seven areas of functioning listed on Dr. Collado's medical source statement, Dr. Collado reported that Plaintiff was unable to function in 6 of the 7 areas, with the lone exception being Plaintiff could handle funds. AR 1665. Because there is very little in Dr. Collado's treatment notes to suggest such extensive limitations, the ALJ did not err in rejecting his opinion as entirely inconsistent with the severe limitations he assessed. This inconsistency was a specific and legitimate reason for the ALJ to discount Dr. Collado's opinion. *See Bayliss*, 427 F.3d at 1216; *Tonapetyan*, 242 F.3d at 1149.

To the extent that Plaintiff argues that the ALJ should have adopted Dr. Collado's opinion because he was the only medical professional to review the medical reports from Plaintiff's three psychiatric hospitalizations in 2011, his argument likewise fails. The determination of a claimant's RFC is wholly within the province of the ALJ. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007). The RFC assessment is based on all the evidence in the record, and it is the ALJ's duty to consider and weigh that evidence. *See id.* And in weighing that evidence, the ALJ pointed to good reasons for questioning the reliability of Plaintiff's hospital stays.

As referenced by the ALJ, although there are several instances in the medical record where Plaintiff was hospitalized for suicidal ideations, or sought psychiatric treatment, Plaintiff cast doubt on those visits because of his repeated references to a singular desire to obtain SSI benefits. AR 306, 787, 1322, 1335, 1343, 1388; 20 C.F.R. §§ 416.927(c)(6) ("When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion"). This doubt was corroborated by Plaintiff's brother who provided a lay opinion to hospital staff that Plaintiff was not suicidal, but merely interested in getting SSI. AR 1388. In formulating Plaintiff's mental RFC, there was no additional duty to include the hospital stays that the ALJ otherwise discredited. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (the ALJ is charged with determining credibility and resolving conflict).

Ultimately, instead of relying on Dr. Collado's unsupported opinion, the ALJ properly afforded greater weight to the medical opinion evidence from the examining and state agency physicians that were consistent with the record as a whole. 20 C.F.R. §§ 416.927 (c)(3),(4) (more weight is given to an opinion and/or medical source if it is well-supported . . .and consistent with the record as a whole); SSR 96-6p (same). Reversal is not warranted on this issue.

### 2. The ALJ's Development of Plaintiff's Knee Impairment

In his next issue, Plaintiff argues that the ALJ had a duty to develop the record with respect to his left knee impairment because subsequent evidence, following his 2011 consultative examination, revealed that Plaintiff had degenerative changes in his left knee. (Doc. 23 at 22-25). According to Plaintiff, the ALJ should have re-contacted a medical professional to review his x-ray report.

In assessing Plaintiff's knee x-rays, the ALJ found as follows:

> X-ray of the bilateral knees on March 13, 2013 revealed mild degenerative changes. Mild spurring of the tibial spines, and a small suprapatellar joint effusion. Otherwise, the examination was normal.
>
> Examination of the claimant's knees on January 8, 2014 reveal diagnoses of derangement of meniscus, chronic meniscal tear, and chondromalacia of patella. The claimant was treated conservatively with medications. On April 9, 2014, examination revealed painful flexion and extension, with motor strength, 4/5. [On] June 11, 2014, it was recommended that the claimant stop riding his bike and wear long pants to cover his knee. Stephanie Rolfo, purportedly completed a disability form for the claimant on June 4, 2014, but there is nothing in the medical evidence of record.
>
> These records do not contain any opinions indicating that the claimant is disabled, but have merely reported the claimant's subjective complaints and suggested treatment modalities.

AR 1387.

An ALJ has a duty to "fully and fairly develop the record and to assure that the claimant's interests are considered." *Tonapetyan*, 242 F.3d at 1150. This duty is triggered when there is "[a]mbiguous evidence" or on "the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence." *Id.* Once the duty is triggered, the ALJ must "conduct an appropriate inquiry," which can include "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow

12

supplementation of the record." *Id.*

However, an ALJ "does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning." *See Brown v. Colvin*, No. 2:15-cv-1430-WBS-CKD, 2016 U.S. Dist. LEXIS 37288, *17 (E.D. Cal. Mar. 21, 2016) ("The standard is one of reasonable good judgment"). Indeed, an ALJ is only required to conduct further inquiries with a treating or consulting physician "if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Id.* The duty to develop the record is typically triggered where, for example, a claimant's medical records are incomplete or there is an "issue sought to be developed which, on its face, must be substantial." *Id.*

Plaintiff's assertion that the ALJ failed to fully and fairly develop the record because she did not have a medical professional review the results of Plaintiff's knee x-rays is meritless. Here, the ALJ's decision specifically acknowledged and discussed Plaintiff's 2013 and 2014 x-rays and related knee impairment, but legitimately found no evidence that the injury would persist, or result in any functional limitations, for 12 months or longer. *See* 42 U.S.C. § 1382c(a)(3)(A) (defining disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.").

The mere existence of x-rays in the record indicating some impairment in Plaintiff's knee and referring Plaintiff for an MRI did not render the record ambiguous or left it so inadequate as to require further development regarding Plaintiff's knee impairment. Rather, the ALJ found that despite some signs of degenerative joint disease in Plaintiff's knees, the resulting recommendations were routine and conservative including that Plaintiff "should stop riding his bike and wear long pants to cover his knee." AR 1387. The ALJ determined that such conservative treatment modalities for his knee pain did not support a finding of disabling knee impairment. AR 1387. Further, the ALJ noted that there exists very little additional evidence in the extensive record indicating that Plaintiff had disabling knee impairment and Plaintiff's own claims largely centered on complications from his skin grafts and his alleged mental impairments rather than significant complications arising from his knees.

Overall, there were no conflicts or ambiguities to be resolved, and ALJ did not find the record

was insufficient to make a disability determination. Consequently, the ALJ's duty to develop the record was not triggered. *See Thomas v. Barnhart*, 278 F.3d 947, 978 (9th Cir. 2002) (duty not triggered when the ALJ did not find the medical report was inadequate to make a disability determination); *Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001). Because the ALJ did not have a duty to develop the record further with respect to Plaintiff's knee impairment, Plaintiff's assertion that the ALJ erred in failing to contact additional physicians to support his allegation of disabling knee pain is without merit.

### 3. The ALJ's Credibility Determinations

In his last issue, Plaintiff argues that the ALJ erred by impermissibly dismissing his subjective pain testimony. Specifically, Plaintiff contends that the ALJ's conclusions regarding his conservative medical treatment and inconsistent testimony were not sufficient. (Doc. 23 at 25-28).

To evaluate the credibility of a claimant's testimony regarding subjective complaints of pain and other symptoms, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that the impairment "could reasonably be expected to cause the severity of the symptom he has alleged; he need only show that it could reasonably have caused some degree of the symptom." *Id*. (emphasis added). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of the symptoms for "specific, clear and convincing reasons" that are supported by substantial evidence. *Id.*

> An ALJ can consider a variety of factors in assessing a claimant's credibility, including:
>
> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.
>
> *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation

14

marks omitted).

Other factors can include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997). An ALJ can only rely on an inconsistency between a claimant's testimony and the objective medical evidence to reject that testimony where the ALJ specifies which "complaints are contradicted by what clinical observations." *Regennitter v. Commissioner of SSA*, 166 F.3d 1294, 1297 (9th Cir. 1999). An ALJ properly discounts credibility if she makes specific credibility findings that are properly supported by the record and sufficiently specific to ensure a reviewing court that she did not "arbitrarily discredit" the testimony. *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991).

In finding that Plaintiff's subjective complaints were less than fully credible, the ALJ provided several reasons as follows: (1) Plaintiff's medical treatment has been conservative in comparison to his allegations of incapacitating symptoms; (2) the record generally suggested that Plaintiff's medical treatment was primarily motivated by his desire to generate evidence for his disability application and appeal; (3) Plaintiff provided inconsistent statements about the extent of his impairments which suggested an attempt to exaggerate his symptoms; (4) Plaintiff had a poor work history; and (5) third parties cast doubt on the veracity of Plaintiff's allegations of disability. AR 1391.

Particularly compelling is the ALJ's finding that Plaintiff provided inconsistent statements that demonstrated that he was less than candid. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("ordinary techniques of credibility evaluation" may be considered, such as prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid."). Here, the ALJ noted that at times in the record Plaintiff claimed to have suffered burns to 70% of his body, but both internal consultative examinations reveal that Plaintiff described his burns as limited to 30-40% of his body. AR 1391. Plaintiff was additionally inconsistent in his explanation about whether he shot his father or whether he witnessed his father being shot. AR 1391. While Plaintiff argues that these statements are not inconsistent because Plaintiff's physicians may have misstated his actual statements, "[w]hen the evidence before the ALJ is subject to more than one

15

rational interpretation, [the Court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). The ALJ could reasonably consider that these inconsistent statements were an attempt to exaggerate his symptoms, therefore undermining Plaintiff's credibility. Given these discrepancies, the ALJ could reasonably conclude that Plaintiff's statements were not entirely reliable. *Alonzo v. Colvin*, 2015 U.S. Dist. LEXIS 122298, 2015 WL 5358151 at *17 (E.D. Cal. Sept. 11, 2015) (one inconsistent statement "comprised a clear and convincing reason to discount Plaintiff's credibility").

Had this been the only reason given, this alone would have been sufficient to support an adverse credibility determination. *See Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1162 (9th Cir. 2008). The Court, however, further concludes that the ALJ supported her credibility finding with additional clear and convincing reasons, including discounting Plaintiff's testimony based on his negligible work history. The ALJ noted that, throughout his lifetime, Plaintiff "has never really worked" which raised questions about whether Plaintiff's alleged inability to work was "truly a result of medical problems." AR 1391. Indeed, evidence in the record indicates that Plaintiff stated that he had "mixed feelings about working [at Walmart] as he does not want to lose getting his SSI back in December when he has his court date." AR 1343. A poor work history is a clear and convincing reason that the ALJ may rely on to reject a Plaintiff's subjective testimony. *See Thomas*, 278 F.3d at 959 (finding an extremely poor work history was a clear and convincing reason that negatively affected claimant's credibility regarding her inability to work).

The ALJ provided at least two clear and convincing reasons supported by substantial evidence to discount Plaintiff's credibility. *See Carmickle*, 533 F.3d at 1163; *Batson*, 359 F.3d at 1197 (finding that striking down one or more justifications for discrediting a claimant's testimony amounted to a harmless error where the ALJ presented other reasons for discrediting the testimony that were supported by substantial evidence in the record). Therefore, even if Plaintiff's other allegations are truly error; the articulated reasons discussed here must lead the Court to affirm the ALJ's adverse credibility decision. Plaintiff's challenge on this ground fails.

///

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court **DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is **DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Gerald Dean Cole.

IT IS SO ORDERED.

Dated: **September 26, 2017**     /s/ *Barbara A. McAuliffe*
                                 UNITED STATES MAGISTRATE JUDGE